Opinion issued January 12, 2023



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00435-CV

————————————

**SOPHIA MARTINEZ, EAST END ON THE BAYOU COMMUNITY ASSOCIATION, AND RESERVE AT EAST END PROPERTY OWNERS ASSOCIATION, Appellants**

**V.**

**DAVID A. NORTHERN, SR., IN HIS CAPACITY AS PRESIDENT AND CEO OF HOUSTON HOUSING AUTHORITY; HOUSTON HOUSING AUTHORITY; MARGARET WALLACE BROWN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF CITY OF HOUSTON'S PLANNING AND DEVELOPMENT DEPARMENT; CITY OF HOUSTON'S PLANNING AND DEVELOPMENT DEPARMENT; MARTHA STEIN, IN HER OFFICIAL CAPACITY AS CHAIR OF HOUSTON PLANNING COMMISSION; CITY OF HOUSTON'S PLANNING COMMISSION; and CITY OF HOUSTON, Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-22238**

---

_____

## NO. 01-22-00811-CV
_____

### IN RE ALAN J. ATKINSON, SOPHIA MARTINEZ EAST END ON THE BAYOU COMMUNITY ASSOCIATION RESERVE AT EAST END PROPERTY OWNERS' ASSOCIATION, Relators

---

### Original Proceeding on Petition for Writ of Mandamus

---

### MEMORANDUM OPINION

This appeal and original proceeding arise from a suit filed by Appellants (1) Sophia Martinez, (2) East End on the Bayou Community Association (East End on the Bayou), and (3) Reserve at East End Property Owners Association (Reserve at East End) against Appellees, who are local governmental entities and officials.[1] In the trial court, Appellants sought declaratory and injunctive relief to stop the approval of a subdivision plat with variances submitted by the Houston Housing Authority in connection with the construction of an affordable housing development.

---

[1] Appellees are (1) the Houston Housing Authority, (2) David A. Northern, Sr., in his official capacity as President and CEO of the Houston Housing Authority, (3) the City of Houston's Planning and Development Department; (4) Margaret Wallace Brown, in her official capacity as Director of the City of Houston's Planning and Development Department; (5) the City of Houston's Planning Commission; (6) Martha Stein, in her official capacity as Chair of the City of Houston's Planning Commission; and (7) the City of Houston.

In response, Appellees filed pleas to the jurisdiction, which the trial court granted, resulting in a judgment of dismissal. On appeal, Appellants assert that the trial court erred in granting the jurisdictional pleas. Because it lacked subject-matter jurisdiction, we hold that the trial court did not err in granting the pleas to the jurisdiction, and we affirm the trial court's judgment.

After the appeal was filed, (1) Martinez, (2) East End on the Bayou, (3) Reserve at East End, and (4) Alan J. Atkinson, an individual not a party to the appeal or the underlying action, filed a petition for writ of mandamus in this Court.[2] We dismiss the mandamus petition for lack of jurisdiction.

## Background

The Houston Housing Authority (HHA) owned Clayton Homes, an affordable, multifamily housing complex in the City of Houston (the City) east of downtown. During Hurricane Harvey, a portion of Clayton Homes's housing units flooded, rendering them uninhabitable.

In 2019, HHA entered into an agreement with the Texas Department of Transportation (TxDOT) to sell Clayton Homes for the construction of a planned freeway expansion. TxDOT agreed to pay $90,000,000 to HHA for Clayton Homes.

---

[2] The underlying case is *Sophia Martinez, et al. v. David A. Northern, Sr., in his official capacity as President and CEO of Houston Housing Authority, et al.*, cause number 2022-22238, pending in the 113th District Court of Harris County, Texas the Hon. Rabeea Sultan Collier presiding.

Under the terms of the agreement, HHA was required to relocate 80 percent of the Clayton Homes housing units to new units located within a two-mile radius of Clayton Homes.

HHA used a portion of the TxDOT funds to buy two adjoining tracts of vacant land east of downtown Houston, totaling approximately 26 acres. The property, located less than a half mile from Clayton Homes, is where HHA planned to construct an affordable multifamily housing development for Clayton Homes residents to relocate. The property lies (1) along the east side of Middle Street (a north-south street that dead-ends near Buffalo Bayou), (2) west of and contiguous with a piece of property owned by a business, (3) north of Navigation Boulevard, and (4) immediately south of the bayou. HHA refers to the planned housing development as 800 Middle because its address will be 800 Middle Street.

The construction of 800 Middle will be completed in two phases. The first phase will include the construction of 400 affordable housing units and a five-story parking garage. The second phase will add 525 housing units. The development will also include public green space and connections to the hike and bike trail along Buffalo Bayou.

Before construction of 800 Middle could begin, the City's Code of Ordinances (Code) required HHA to obtain approval of a subdivision plat from the City's Planning Commission. *See* HOUS., TEX., CODE OF ORDINANCES, ch. 42, art. II, § 42-

20(a) ("[A]ny subdivision of property in the city . . . shall require a subdivision plat approved pursuant to this article.")[3]; *see also id.* § 42-71(b) ("The [Planning Commission] shall approve each subdivision plat that complies with the provisions of this chapter and other applicable laws and requirements.").

Chapter 42 of the Code "establishes the general rules and regulations governing plats, subdivisions and development of land within the city . . . to promote the health, safety, morals and general welfare of the city and the safe, orderly and healthful development of the city." *Id.* art. I, § 42-2. Code section 42-81(a), entitled "Variances,"[4] authorizes the Planning Commission

> to consider and grant variances from the requirements of [Chapter 42] by majority vote of those members present and voting . . . when the commission finds that each of the following conditions exist:
>
> (1)  Either:
>
> a.  The imposition of the terms, rules, conditions, policies and standards of [Chapter 42] would create an undue hardship by depriving the applicant of the reasonable use of the land; or
>
> b.  Strict application of the requirements of [Chapter 42] would make a project infeasible due to the existence of unusual physical characteristics that affect the property in

---

[3]   *See* HOUS., TEX., CODE OF ORDINANCES, ch. 42, art. I, § 42-1 (defining "subdivision" to mean "the division of a tract of land, including a lot, into two or more parts to lay out a subdivision of the tract, . . . or to lay out streets, . . . parks or other parts of the tract intended to be dedicated to public use. . ..").

[4]   *See id.* (defining "variance" as "a commission-approved deviation from the requirements of [chapter 42] issued under section 42-81 of this Code").

> question, or would create an impractical development or one otherwise contrary to sound public policy;

> (2) The circumstances supporting the granting of the variance are not the result of a hardship created or imposed by the applicant;

> (3) The intent and general purposes of [Chapter 42] will be preserved and maintained;

> (4) The granting of the variance will not be injurious to the public health, safety or welfare; and

> (5) Economic hardship is not the sole justification for the variance.

*Id.* § 42-81(a).

HHA submitted a plat application for 800 Middle to the City's Planning and Development Department along with two variance requests.[5] The variances pertained to the construction of two east-west public streets—Kennedy Street and Ball Street—that would be constructed as part of the 800 Middle development.

Kennedy Street already existed as a public street west of, and intersecting with, Middle Street where Kennedy Street dead-ended. The proposed plat showed Kennedy Street extending east from Middle Street through 800 Middle to the development's eastern boundary. The proposed Kennedy Street extension through the development aligned with the already-existing Kennedy Street on the west side of Middle Street.

---

[5] The application was filed on behalf of HHA by Ally General Solution.

Unlike Kennedy Street, Ball Street did not already exist west of Middle Street. The proposed plat showed Ball Street beginning on the east side of Middle Street and extending through the 800 Middle development to its eastern boundary.

A company owns the property adjacent to and east of the 800 Middle property. The backside of the adjacent property shares a boundary with the backside of the 800 Middle property.

The street fronting the adjacent property, and providing access to it, is North Velasco Street, a north-south street. The proposed plat for the development showed Kennedy Street and Ball Street dead-ending on the eastern side of 800 Middle's property near the property line with the adjacent property. Neither Kennedy nor Ball Street would extend through the adjacent property to connect with North Velasco Street.

In its variance application, dated February 21, 2022, HHA indicated that it sought a variance from Code section 42-134, entitled "Street extension," which governs when a public street, "without means of a vehicular turnaround," must be extended beyond a plat's boundary. *See id.* art. III, § 42-134(a). HHA stated that it sought a variance "to not extend" Kennedy Street "east of the plat boundary."

7

Similarly, it sought a variance "to not extend Ball Street nor terminate [it] with a cul-de-sac."[6]

In support of its application, HHA asserted that each of the five conditions listed in section 42-81(a) required for granting a variance were satisfied. HHA addressed each of the conditions, explaining why each condition existed with respect to the 800 Middle development.

On March 9, 2022, the City's Planning and Development Department sent a "Notice of Variance" to property owners in the vicinity of 800 Middle. The notice stated that the department had "received a subdivision plat application with a variance request for a property located east along Middle Street, north of Navigation Blvd and south of Buffalo Bayou." The notice informed the property owners that the variance request was made "on behalf of the developer" and that "[t]he applicant [was] requesting a variance to not extend . . . Kennedy Street and Ball Street and to not terminate Ball Street with a cul-de-sac."

The notice informed the property owners that the Planning and Development Department staff was reviewing the application and would make a recommendation about the application to the Planning Commission. It explained that the Planning Commission "is the non-legislative body authorized to review and render decisions

---

[6]    A cul-de-sac "mean[s] a street with only one outlet that terminates in a vehicular turnaround appropriate for the safe and convenient reversal of traffic movement." *Id.*

on subdivision applications and requests." The notice stated that the Planning Commission would hold a public meeting to consider the application on March 17, 2022, and that members of the public could attend the meeting "[to] make comments or express concerns about the proposed project."

Members of the public attended the March 17 meeting. Three speakers supported the project and three speakers opposed it. One of the speakers opposing approval of the plat was Alan J. Atkinson, a developer and neighborhood property owner. Based on the recommendation of the Planning and Development Department staff, the Planning Commission decided to defer the decision on the 800 Middle plat for two weeks for further study.

On March 30, 2022, Atkinson emailed a letter to the Planning and Development Department. In the letter, he voiced his opposition to the variances that sought not to extend Ball and Kennedy Streets. He asserted that the neighborhood streets west of 800 Middle, which would provide ingress and egress to the development, were "substandard because many lack[ed] sidewalks, have roadside ditches, are narrow and have houses built very close to the street." Atkinson stated that "the neighborhood residents [were] concerned with the disruptive impact on their community due to traffic, congestion, and accessibility issues that this project will generate by forcing thousands of cars per day through the neighborhood." He

urged that Ball Street should be extended to North Velasco Street to make that the main access point for 800 Middle.

On March 31, 2022, the Planning and Development Department staff issued a written report to the Planning Commission regarding HHA's variance requests for 800 Middle. In the recommendation, the staff discussed each of the five conditions listed in section 42-81(a) required for a variance to be granted. The Staff concluded that each condition existed with respect to the requested variances. The staff recommended that the variances be granted and that the proposed subdivision plat for 800 Middle be approved. As support for the recommendation, the staff stated that if the proposed streets were extended east from 800 Middle's boundary to North Velasco Street, the streets would not align with the street grid west of the property. The staff explained that Kennedy and Ball Streets could "be extended when the tracts to the east [of 800 Middle] are redeveloped."

The staff also noted that 800 Middle included "greenspace along Middle [Street] [that would] provide a trail connection to Buffalo Bayou as well as turnaround to facilitate traffic circulation." The staff also noted that 800 Middle will be "within close proximity of multiple bus routes, walking trails, and is within a mile from Metro's rapid transit system." The staff wrote that "[t]he variance [was] justified by the proposed street improvements and the existing street grid and

multimodal transit systems." They stated, "The provision of new public streets and improvements to Middle [Street] will provide safe traffic circulation . . .."

On April 12, 2022, Sophia Martinez, East End on the Bayou, and Reserve at East End (collectively, Appellants) filed suit to stop the approval of the subdivision plat and variances for 800 Middle. Martinez alleged that she lived on the already-existing portion of Kennedy Street that would "soon be connected to a proposed construction of a one block long extension of her street to the east." East End on the Bayou and Reserve at East End alleged that they were "domestic non-profit corporations formed to promote the maintenance, administration, and preservation of properties, both privately-owned and commonly held, within two subdivisions in close proximity and directly contiguous to the proposed 800 Middle Apartments."

As defendants, Appellants named numerous governmental units and officials, seeking a declaratory judgment under the Uniform Declaratory Judgments Act (UDJA) and injunctive relief. As defendants, Appellants named (1) HHA, (2) David A. Northern, Sr., in his official capacity as President and CEO of HHA, (3) the Planning and Development Department; (4) Margaret Wallace Brown, in her official capacity as Director of the City of Houston's Planning and Development Department; (5) the Planning Commission; (6) Martha Stein, in her official capacity as Chair of the Planning Commission; and (7) the City (collectively, Appellees).

In their petition, Appellants asserted that constructing Kennedy and Ball Streets without connecting them to North Velasco Street would create an unsafe level of traffic through their neighborhood because their streets would provide the only route to and from 800 Middle. Appellants claimed that the proposed subdivision plat and requested variances did not meet the requirements of Chapter 42.

Appellants argued that "[the] requested variances, if granted, would violate the connectivity requirements of Chapter 42 of the Houston Code of Ordinances" because "the proposed streets would not connect with pre-existing right of ways." Appellants asserted that an undeveloped right-of-way for Ball Street already existed 50 feet south of where HHA proposed to construct Ball Street. They alleged that the undeveloped right-of-way extended east through the adjacent property, connecting with North Velasco Street. Appellants claimed that, because Chapter 42 required a proposed street to connect with an existing street, "there is no legal basis for HHA to ignore the existing Ball Street Right of Way and instead seek to construct a street that fails to connect to anything but simply dead ends into the eastern fence boundary of [800 Middle]." Appellants also pointed to a Kennedy Street right-of-way east of 800 Middle. They claimed that "[n]o effort was made to locate the eastern terminal end of the proposed Kennedy Street in alignment with the existing Kennedy Avenue Right of Way." They contended that the "net effect" of the requested variances was "twofold": (1) "no traffic from [800 Middle] would flow towards [North] Velasco

12

Street to the east;" and (2) "all traffic will be forced to flow through the existing neighborhood at . . . two Middle Street intersections."

Appellants also asserted that the proposed plat "violate[d] the intersection spacing requirements" of Code section 42-128. *Id.* § 42-128. Because Ball and Kennedy Streets did not connect with North Velasco Street, Appellants claimed that section 42-128 required that the distance between streets' intersections with Middle Street be less than 1,400 feet. They asserted that the intersections, as platted, were not compliant because they were 1,450 feet apart.

Appellants further alleged that, in a final environmental assessment for 800 Middle, HHA had represented that it would submit a traffic impact analysis to the Planning and Development Department as a prerequisite to obtaining building permits for the development. Appellants alleged that HHA had not performed the traffic impact analysis before submitting its plat application and variance requests. Appellants referenced a traffic impact analysis from an unidentified source which they claimed determined that the development would result in "4,690 new vehicle trips per day" through their neighborhood.

Finally, Appellants listed the five section 42-81(a) conditions that the Planning Commission needed to find existed before it could grant the variances. Appellants asserted that the variances should not be granted because "[n]one of the five necessary criteria" had been met.

13

To defeat the defendants' presumptive jurisdictional bar to suit, Appellants claimed that Northern, Brown, and Stein, in their official capacities, had acted ultra vires—that is, without legal authority—in requesting and approving the variances in their respective roles. Appellants asserted that the UDJA waived governmental immunity for the four governmental units—(1) HHA, (2) the Planning and Development Department, (3) the Planning Commission, and (4) the City.

Pursuant to the UDJA, Appellants asked the trial court to declare that

(i) HHA's Plat application, which propose[d] the current locations of Ball Street and Kennedy Street to not connect with existing right of ways to the east towards Velasco Street, violate[d] the connectivity requirements of Chapter 42 of the Houston Code of Ordinances;

(ii) HHA's Plat application, which propose[d] the current locations of Ball Street and Kennedy Street to not connect with existing right of ways to the east towards Velasco Street, violate[d] the spacing requirements of Chapter 42 of the Houston Code of Ordinances;

(iii) none of the five required variance criteria [were] met and the variances requested by [HHA were] illegal;

(iv) because the proposed variances [were] illegal, the Plat application must be denied;

(v) because the plat application [was] illegal, no building permits should be approved;

(vi) because Middle Street and the streets to the west and south of the Project cannot be improved to comply with the spacing requirements of Chapter 42 of the Houston Code of Ordinances, any additional flow of traffic from the Project must be directed easterly toward N. Velasco Street, such that all vehicular traffic shall be required to flow towards Velasco Street;

14

(vii) Neither the Ultra Vires Defendant Northern nor the Defendant HHA had the legal or constitutional authority to request the variances set forth in the Plat application and therefore [Northern's] decision to do so constitutes an ultra vires act;

(viii) Neither the Ultra Vires Defendants Brown or Stein nor the Houston Planning and Development Department and Houston Planning Commission have the legal or constitutional authority to approve the variances set forth in the Plat application and therefore any decision to do so would constitute an ultra vires act;

(viii) (sic) To meet the connectivity and intersection spacing requirements of Chapter 42 of Houston's Code of Ordinances, Defendants should be required to align the eastern terminal end of proposed Kennedy Street to connect to N. Velasco Street; [and]

(ix) (sic) HHA's proposal, which would create an additional 4,690 vehicular trips per day, is illegal and would harm the health and safety of existing residents to the west of Middle Street, including, but not limited to, each of the Plaintiffs herein.

Appellants also pursued a temporary restraining order, a temporary injunction, and a permanent injunction, seeking to prohibit (1) approval of the plat application; (2) approval of the requested variances; (3) issuance of any building permits for the 800 Middle development; (4) commencement of "any construction activities for the proposed street grid extensions set forth in the Plat application"; and (5) submission or approval of "any future Plat application which violate[d] the intersection connectivity and spacing requirements" of Chapter 42.

On April 13, 2022—the day after Appellants' filed their petition—the ancillary judge denied Appellants' application for a temporary restraining order. The next day, the Planning Commission approved the subdivision plat with the requested

15

variances for 800 Middle. A revised plat containing the variances was officially recorded in the Harris County real property records on May 2, 2022.

On May 6, 2022, the City defendants—the City, the Planning Commission, the Planning and Development Department, Brown, and Stein—filed a plea to the jurisdiction. HHA and Northern also filed a plea to the jurisdiction, which they amended on May 9, 2022. In the jurisdictional pleas, Appellees offered several grounds for dismissing Appellants' suit for lack of subject-matter jurisdiction. Among the grounds, Appellees asserted that Appellants' suit was barred by governmental immunity. Appellees contended that Appellants had not pleaded a valid waiver of immunity for the governmental entities—HHA, the Planning Commission, the Planning and Development Department, and the City. And Appellees asserted that Appellants' ultra vires claims against Northern, Brown, and Stein failed because the officials had not acted without legal authority with respect to the plat application and variances.

In their response to the jurisdictional pleas, Appellants argued that the four governmental entities' immunity was waived because the UDJA "contains a waiver of immunity from suit for governmental bodies whose presence is necessary to effectuate and bind them to a judicial declaration." Appellants argued that Northern, Brown, and Stein had engaged in ultra vires conduct because their actions had exceeded their respective legal authority.

16

On May 20, 2022, the trial court conducted an evidentiary hearing on Appellants' application for a temporary injunction. That same day, the trial court denied the application. The trial court also signed an order granting HHA's and Northern's plea to the jurisdiction and dismissing Appellants' claims for injunctive and declaratory relief against them. On June 2, 2022, the trial court signed an order granting the City defendants' plea to the jurisdiction and dismissing Appellants' claims against those parties. In its orders, the trial court did not identify the reason for granting the pleas to the jurisdiction.

The trial court's second order granting the City defendants' jurisdictional plea resulted in a final judgment because it disposed of the remaining parties and claims in the suit. *See H.B. Zachry Co. v. Thibodeaux*, 364 S.W.2d 192, 193 (Tex. 1963) (holding prior interlocutory orders merged into later order disposing of remaining parties and issues, creating final and appealable judgment). Appellants now appeal the judgment, raising five issues.

After the appeal was filed, Relators Martinez, East End on the Bayou, Reserve at East End, and Alan J. Atkinson, who is not a party to the appeal or the underlying action, filed an original mandamus proceeding in this Court related to the dispute over the approval of the plat with the variances.

17

**Appeal of Judgment Granting Pleas to the Jurisdiction**

In their first four appellate issues, Appellants claim that the trial court erred by granting Appellees' pleas to the jurisdiction. Because they are dispositive, we begin with Appellants' third and fourth issues in which they contend that the trial court erred by granting the jurisdictional pleas based on governmental immunity.

**A.     Standard of Review**

A plea to the jurisdiction is a procedural vehicle used to challenge the court's subject-matter jurisdiction over a claim. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 232 (Tex. 2004). Whether a court has subject-matter jurisdiction is a question of law, *id.* at 226, and we review de novo a trial court's ruling on a plea to the jurisdiction, *Suarez v. City of Tex. City*, 465 S.W.3d 623, 632 (Tex. 2015). In doing so, we exercise our own judgment and redetermine each legal issue, without giving deference to the lower court's decision. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1999).

When reviewing a trial court's ruling on a challenge to its jurisdiction, we consider the plaintiff's pleadings and factual assertions, as well as any evidence relevant to the jurisdictional issue. *See City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625–26 (Tex. 2010); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). We construe pleadings liberally in favor of the plaintiff, look to the pleader's intent, and determine if the pleader has alleged facts affirmatively demonstrating the

court's jurisdiction. *City of Elsa*, 325 S.W.3d at 625; *Miranda*, 133 S.W.3d at 226. Allegations found in pleadings may affirmatively demonstrate or negate the court's jurisdiction. *City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009). "If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Miranda*, 133 S.W.3d at 227.

## B.     Waiver of Governmental Entities' Immunity

Before addressing their third issue, we address Appellants' fourth issue. There, Appellants argue that the trial court erred by granting Appellees' pleas to the jurisdiction because their claims against the governmental entities were not barred by governmental immunity.

Governmental immunity protects the State's political subdivisions, including its cities, against suits and legal liability. *Dohlen v. City of San Antonio*, 643 S.W.3d 387, 392 (Tex. 2022). "Where a government entity challenges jurisdiction on the basis of immunity, 'the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity.'" *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 927 (Tex. 2015) (quoting *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003)).

In their petition, Appellants claimed that the UDJA waived the governmental immunity of the four governmental entities—HHA, the Planning Commission, the

Planning and Development Department, and the City.[7] Specifically, Appellants asserted that the UDJA "contains a waiver of immunity from suit for governmental bodies whose presence is necessary to effectuate and bind them to a judicial declaration." Because Appellants misconstrue the limited waiver of immunity provided by the UDJA, we disagree with their assertion.

"While the [UDJA] waives sovereign immunity for certain claims, it is not a general waiver of sovereign immunity." *Tex. Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 388 (Tex. 2011) (citing TEX. CIV. PRAC. & REM. CODE § 37.006(b) and *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009)). The UDJA provides only a limited waiver for challenges to the validity of an ordinance or statute. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 552 (Tex. 2019). "UDJA claims requesting other types of declaratory relief are barred absent a legislative waiver of immunity with respect to the underlying action." *Id.*

Appellants' petition provided a summary of the declaratory relief they sought:

---

[7] The City contends that the Planning and Development Department is a department of the City and not a separate governmental entity. *See* HOUS., TEX., CODE OF ORDINANCES, ch. 33, art. I, § 33-1 ("There is hereby created and established within and for the city a department to be known as the department of planning and development."). The City asserts that, to be sued, the Planning and Development Department must "enjoy a separate legal existence." *Darby v. City of Pasadena Police Dep't*, 939 F.2d 311, 313–14 (5th Cir. 1991) (quoting *Mayes v. Elrod*, 470 F.Supp. 1188, 1192 (N.D. Ill. 1979)). The City points out that Appellants did not allege that the department enjoys a separate legal existence. The City cites this as a ground to affirm the dismissal of Appellants' claims against the department. However, given our disposition below of the governmental-immunity issue, we need not decide the propriety of the City's contention.

20

Plaintiffs seek a judicial declaration that, due to two (2) proposed street grid extensions and requests for two (2) variances, each of which violate both the connectivity and spacing requirements contained within Chapter 42 of Houston's Code of Ordinances, Defendant HHA's current plat application must be denied, the Ball Street and Kennedy Street variances must be denied, and any future plat application must not attempt to force the flow of vehicular traffic to the west, but must instead provide ingress and egress into the planned development from the east, by and through [North] Velasco Street.

Appellants also requested declarations (1) that Northern and HHA lacked "the legal or constitutional authority to request the variances . . . and therefore [Northern's] decision to do so constitute[d] an ultra vires act" and (2) that the five City defendants lacked "the legal or constitutional authority to approve the variances . . . and therefore any decision to do so would constitute[d] an ultra vires act."

The declarations sought by Appellants did not challenge the validity of the City's ordinances. Instead, Appellants relied on the validity of Chapter 42 of the City's ordinances to support their challenges to the approval of the plat application and variances. Appellants sought declarations that the variances and any plat application containing them must be denied because they violated Chapter 42. In so doing, Appellants sought a determination of the validity of the subdivision plat with the variances under Chapter 42 and challenged the actions of the governmental entities and officials under the ordinances. But Appellants did not challenge the validity of the ordinances. The Supreme Court of Texas has been clear that the UDJA does not waive immunity when a plaintiff seeks a declaration of rights under a statute

21

or challenges a governmental entity's actions under a statute or ordinance. *Becky, Ltd. v. City of Cedar Park*, No. 03-15-00259-CV, 2017 WL 2224527, at *6 (Tex. App.—Austin May 19, 2017, no pet.) (mem. op.) (citing *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011) (per curiam)); *see Heinrich*, 284 S.W.3d at 373 n.6) (distinguishing claims challenging validity of statute and those challenging state's actions under statute)).

We conclude that that the UDJA did not waive the governmental entities' right to immunity from Appellants' suit.[8] We hold that the trial court correctly granted the pleas to the jurisdiction with respect to Appellants' claims against the governmental entities. Accordingly, we overrule Appellants' fourth issue.

## C. Ultra Vires Claims Against Governmental Officials

We next turn back to Appellants' third issue. In that issue, Appellants argue that, because the ultra vires exception to governmental immunity applies, the trial court erred by granting the pleas to the jurisdiction with respect to their claims against the governmental officials in their official capacities.

---

[8] To the extent that Appellants claimed that the governmental entities' immunity was waived because they acted ultra vires, such claim would not support a waiver of the governmental entities' immunity. *See Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 348 (Tex. 2019) ("The court of appeals correctly held that the State's *ultra vires* claim cannot proceed against the District itself. An *ultra vires* claim may name a government official in his official capacity, but the underlying governmental entity remains immune from suit.").

### 1.    *Legal Principles*

Even if a governmental entity's immunity has not been waived by the Legislature, a claim may be brought against a governmental official if the official engages in ultra vires conduct. *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017). Here, Appellants alleged in their petition that government officials Stein, Brown, and Northern engaged in ultra vires conduct entitling Appellants to declaratory and injunctive relief. *See Heinrich*, 284 S.W.3d at 373–75 (recognizing that Texas law permits ultra vires claims seeking prospective injunctive and declaratory relief against individual government officials in their official capacities).

"To fall within the *ultra vires* exception to governmental immunity, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. "Thus, *ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state." *Id.* To reassert such control, an ultra vires suit must lie against the "allegedly responsible government actor in his official capacity." *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 76 (Tex. 2015).

When, as here, "[a]n *ultra vires* claim is based on actions taken 'without legal authority,' the claim has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that

23

authority." *Hall*, 508 S.W.3d at 239. "[A] government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016). Stated another way, a government officer acts without legal authority if his exercise of judgment or limited discretion is "without reference to or in conflict with the constraints of the law authorizing the official to act." *Id.* at 163. If the challenged actions "were not truly outside the officer's authority or in conflict with the law," then the plaintiff has not stated a valid ultra vires claim and governmental immunity will bar the suit. *Matzen v. McLane*, — S.W.3d —, 2021 WL 5977218, at *4 (Tex. Dec. 17, 2021).

### 2. *Martha Stein & Margaret Wallace Brown*

The Planning Commission is the municipal authority responsible for reviewing and approving subdivision plats in Houston. *See* TEX. LOC. GOV'T CODE § 212.006; HOUS., TEX., CODE OF ORDINANCES, ch. 33, art. II, § 33-22(a). Martha Stein serves as Chair and a voting member of the Planning Commission. Margaret Wallace Brown serves as Director of the Planning and Development Department. She also serves as Secretary of the Planning Commission and as an ex officio member. *See* HOUS., TEX., CODE OF ORDINANCES ch. 33, art. II, § 33-14 (providing that director or director's designee "shall serve as ex officio member and secretary

24

to the commission"). In their petition, Appellants stated that "Stein's final approval of the plat application would constitute an ultra vires act." Appellants requested a declaration that Stein and Brown were without legal authority "to approve the variances set forth in the Plat application."

The Supreme Court of Texas has recognized that "plat approval is a discretionary function that only a governmental unit can perform." *City of Round Rock v. Smith*, 687 S.W.2d 300, 303 (Tex. 1985). "[O]nce the relevant governmental unit determines that a plat conforms to applicable regulations, it has a ministerial duty to approve that plat." *Schroeder v. Escalera Ranch Owners' Assoc., Inc.*, 646 S.W.3d 329, 332 (Tex. 2022) (citing TEX. LOC. GOV'T CODE §§ 212.005, 212.010; *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 895 (Tex. App.—Houston [1st Dist.] 2008, pet. denied)). But only exercises of absolute discretion by governmental officials are absolutely protected by governmental immunity. *See Hous. Belt*, 487 S.W.3d at 164. And "whether a suit attacking an exercise of limited discretion will be barred is dependent upon the grant of authority at issue in any particular case." *Id.* "[M]any legislative grants of authority, although not absolute, will be broad enough to bar most, if not all, allegedly *ultra vires* claims." *Id.*

In *Hall*, the Supreme Court of Texas held that a legislative grant of authority was broad enough to bar an ultra vires claim. 508 S.W.3d at 243. There, a regent of a public university sought a writ of mandamus against its chancellor to compel

25

production of university records. *Id.* at 237. The chancellor had determined that federal law protected the records. *See id.* at 236–37. The issue was whether the chancellor's discretion to interpret federal law could be challenged in court. *See* 237–38. The university's rules gave the chancellor a duty to "determine whether a Regent may review information protected by [federal law]." *Id.* at 242. The *Hall* court ultimately determined that the chancellor's discretion under university's rules to interpret federal law was not subject to judicial review under the ultra vires exception. *See id.* at 243.

In reaching its holding, the *Hall* court distinguished its earlier holding in *Houston Belt*, a case in which the supreme court held that a plaintiff-railroad's challenge to a drainage fee assessment could proceed as an ultra vires suit. *Id.* at 241; *Hous. Belt*, 487 S.W.3d at 169. In *Houston Belt*, the plaintiff-railroad's pleadings alleged conduct by the acting government official, Houston's Director of Public Works and Engineering, outside the scope of his discretion. *See Hous. Belt*, 487 S.W.3d at 167–69.

The plaintiff-railroad had complained that the director had acted ultra vires in imposing the drainage fee based on an unlawful determination of the permeability of the plaintiff's property. *Id.* at 159–60. A Houston ordinance had charged the director with "administration of [the ordinance] . . . in accordance with and subject to the provision of [the ordinance]." *Id.* at 165. Another provision commanded the

26

director to make the permeability determinations "on the basis of digital-map data . . . or other similar reliable data as shall be determined by the director." *Id.* at 159. Instead of using digital map data, or something similar, the director looked at aerial photographs to make his permeability determination. *Id.* at 169. The *Houston Belt* court determined that, while the ordinance gave some discretion to the director, the discretion was not absolute. *See id.* at 168. As a result, the director's misinterpretation of his own limits in making the permeability determination was a valid basis for an ultra vires claim. *Id.* at 169.

In *Hall*, the court contrasted the university rules involved there, which placed a duty on the chancellor to "determine whether a Regent may review information protected by" federal law, with the ordinance in *Houston Belt*, which "limited the Director's discretion in *how* he reached a conclusion." *Hall*, 508 S.W.3d at 242. The *Hall* court stated that, "[w]hen the ultimate and unrestrained objective of an official's duty is to interpret collateral law"—that is, law collateral to the law authorizing him to act—"a misinterpretation [of the collateral law] is not overstepping [his] authority; it is a compliant action even if ultimately erroneous." *Id.* For that reason, the supreme court held that Hall's discretion under university rules (the authority authorizing him to act) to interpret federal law (law collateral to the rules) was not subject to judicial review. *Id.* at 243.

Recently, the supreme court applied *Hall*'s reasoning in *Schroeder*. *See* 646 S.W.3d at 334–35. There, the supreme court determined that the commissioners of the City of Georgetown's Planning and Zoning Commission did not act ultra vires in approving a subdivision plat because the commissioners had acted within the enabling ordinance's constraints. *See id.* at 335–36.

In *Schroeder*, a homeowners association sued the commissioners in their official capacities. *Id.* at 331. The homeowners association claimed that the approved subdivision plat did not conform to Georgetown's ordinances, making the commissioners' approval of the plat a clear abuse of discretion. *Id.* The homeowners association sought mandamus relief directing the commissioners to rescind their approval of the plat. *Id.*

The court recognized that under Georgetown's Unified Development Code (UDC) "[t]he Planning and Zoning Commission shall be responsible for considering and taking final action on . . . Preliminary Plat[s]." *Id.* at 334 (quoting GEORGETOWN, TEX., UNIFIED DEV. CODE § 2.05.010(A)(1)). The UDC also required that "[n]o Preliminary Plat shall be approved without a determination" by the commission "that the plat conforms' to UDC requirements and other law." *Id.* (quoting GEORGETOWN, TEX., UNIFIED DEV. CODE § 3.08.070(C)(2)). The UDC's only restriction on the commission's discretion was requiring it "[to] consider the Preliminary Plat application, the Director's report, State law, and compliance with this Unified

Development Code" when determining whether the plat conformed to the UDC "and other law." *Id.* at 334–35 (quoting GEORGETOWN, TEX., UNIFIED DEV. CODE § 3.08.070(D)(1)).

The supreme court explained, "While the UDC limits the discretion of what the Commission may consider, it does not otherwise restrict the Commission's exercise of its discretion to determine conformity." *Id.* at 335. If the commissioners considered the listed items, which the supreme court held they did, "the UDC commit[ted] to them the discretion to determine [the] plat's conformity for approval purposes." *Id.* "Even if incorrect in their conclusion [that the plat conformed to the UDC], the Commissioners did not exceed the scope of their authority." *Id.*

The court noted that the plaintiff-homeowners association "[did] not allege that the commissioners made the conformity determination based on improper considerations." *Id.* Instead, the association "assert[ed] that the Commissioners simply got the determination wrong." *Id.* But "[n]either the UDC nor State law allow third parties to second-guess the Commission's decision in this way." *Id.*

Like the *Schroeder* court, we conclude that the reasoning in *Hall* governs here. Houston's Code section 42-71, entitled "Commission consideration and action," provides in part:

> (a) The commission shall consider and act on each class III plat submitted to it on a preliminary basis and upon a final basis. The commission shall consider and act on each class II plat submitted to it on a final basis. The commission shall consider and act on each

29

subdivision plat or development plat that requests a variance or special exception. The commission also shall consider and act on each class I plat . . . that is referred to the commission by the director.

(b) The commission shall approve each subdivision plat that complies with the provisions of this chapter and other applicable laws and requirements.

HOUS., TEX., CODE OF ORDINANCES ch. 42, art. II, § 42-71(a)–(b).

The record indicates that the subdivision plat for 800 Middle was a "class III plat." *See id.* § 42-23(b). Code section 42-74, entitled "Commission consideration and action—Class III plat," provides in part:

(a) The commission shall consider and act on each preliminary class III plat and each final class III plat as provided in this section.

(b) Upon consideration of a preliminary class III plat, the commission shall:

(1) Grant approval of the preliminary class III plat, with or without conditions, upon finding that it meets all the applicable requirements of [Chapter 42] and other applicable law;

(2) Approve one or more requested variances . . ., in whole or in part, with or without conditions, pursuant to section 42-81 . . . of this Code, as applicable, and approve the preliminary class III plat with the variance . . . so granted[.]

*Id.* § 42-74 (a), (b)(1)–(2). Section 42-81, governing variances, authorizes the Planning Commission "to consider and grant variances from the requirements of [Chapter 42] by majority vote of those members present and voting . . . for any subdivision plat . . . when the commission finds that [five listed] conditions exist." *Id.* § 42-81(a).

30

As shown, the Code directs the Planning Commission to determine a plat's conformity. The Supreme Court of Texas has explained that the determination of a plat's conformity "is a discretionary one that necessarily involves 'interpreting and construing applicable ordinances.'" *Schroeder*, 646 S.W.3d at 335 (quoting *Smith*, 687 S.W.2d at 303 (cleaned up)). Other than requiring consideration of the plat, which was considered here, the Code does not otherwise constrain the Planning Commission's discretion in determining a class III plat's conformity with Chapter 42 and "other applicable law."[9] *See id.*; *Hall*, 508 S.W.3d at 242–43 (explaining that,

---

[9] In their reply brief, Appellants assert that the Planning Commission's discretion was limited by an alleged requirement that, before approving the plat with the variances, the commission was required to consider "Chapter 15 of the [City of Houston's] Public Works Infrastructure Design Manual" and "federal law governing HHA projects," which they contend, in turn, required the commission to consider traffic studies. As support, Appellants rely on *Schroeder v. Escalera Ranch Owners' Association, Inc.*, in which (as discussed) the UDC required the Georgetown Planning and Zoning commission "[to] consider the Preliminary Plat application, the Director's report, State law, and compliance with this Unified Development Code" when determining whether a plat conformed "to UDC requirements and other law." 646 S.W.3d 329, 334–35 (Tex. 2022) (quoting GEORGETOWN, TEX., UNIFIED DEV. CODE § 3.08.070(C)(2), (D)(1)). The supreme court recognized that the UDC provision "limit[ed] the discretion of what the Commission may consider, [but] it [did] not otherwise restrict the Commission's exercise of its discretion to determine conformity." *Id.* at 335. Here, Chapter 42 does not contain a similar limitation. Nonetheless, Appellants contend that section 42-71(b), which states that "[t]he commission shall approve each subdivision plat that complies with the provisions of this chapter and other applicable laws and requirements," required the Planning Commission to consider "Chapter 15 of the [City of Houston's] Public Works Infrastructure Design Manual" and "federal law governing HHA projects" when determining whether the 800 Middle plat should be approved. HOUS., TEX., CODE OF ORDINANCES ch. 42, art. II, § 42-71(b). They assert that Chapter 15 and "federal law governing HHA projects" were "other applicable laws and requirements" as referenced in section 42.71(b). But section 42-71(b) does not limit what the Planning Commission may consider in exercising its discretion like the UDC

31

if university chancellor was only "tasked with making a determination" and "that [was] it," chancellor's "discretion in making that determination [was] otherwise unconstrained").

At the heart of Appellants' claims is their allegation that the Planning Commission could not determine that the subdivision plat for 800 Middle conformed to Chapter 42 because the plat violated the chapter's street connectivity and spacing provisions. In other words, Appellants alleged that any determination by the Planning Commission that the plat conformed with Chapter 42 would be (and was) wrong. However, when government officials like members of the Planning Commission are given unconstrained discretion to interpret laws collateral to their enabling authority, a misinterpretation of the law is not overstepping their authority. *See Hall*, 508 S.W.3d at 242. The misinterpretation may be erroneous but is nonetheless compliant with the granted authority. *See id.* As the supreme court explained,

> [A]n *ultra vires* doctrine that requires nothing more than an identifiable mistake would not be a narrow exception to immunity: it would swallow immunity. After all, do not all successful lawsuits require a legal wrong? As important as a mistake may be, sovereign immunity comes with a price; it often allows the 'improvident actions' of the government to go unredressed.

---

provision did in *Schroeder*. Instead, section 42-71(b) reflects the Planning Commission's unrestricted discretion to determine whether a plat "complies with the provisions of [Chapter 42] and other applicable laws and requirements." *Id.*

*Id.* at 242–43.

Here, the requested variances aside, the Planning Commission had the unconstrained discretion to determine whether the plat conformed with Chapter 42's street connectivity and spacing provisions. In other words, even if the members of the Planning Commission misinterpreted the connectivity and spacing ordinances in finding that the 800 Middle plat conformed with the ordinances, such erroneous decision would nonetheless be within the scope of the commission's authority. *See Schroeder*, 646 S.W.3d at 335; *Hall*, 508 S.W.3d at 242.

In any event, HHA did request variances—meaning a deviation from Chapter 42's requirements—not to extend Kennedy and Ball Streets beyond 800 Middle's western boundary. Appellants asserted that, if Kennedy and Ball Streets were extended to North Velasco Street, the connectivity and spacing requirements would be satisfied, but, if the variances were granted, those requirements would not be met.

Section 42-71(a) requires the Planning Commission to "consider and act on each subdivision plat or development plat that requests a variance," while section 42-74(b) requires the commission to "[a]pprove one or more requested variances" pursuant to section 42-81 and to approve the plat with the granted variance. HOUS., TEX., CODE OF ORDINANCES ch. 42, art. II, §§ 42-71(a), 42-74(b). In turn, section 42-81 authorizes the Planning Commission to grant variances from the requirements of Chapter 42 when the commission finds that each of five listed conditions exist. *See*

*id.* § 42-81. The only restriction placed on the Planning Commission's authority to grant a variance is the requirement that it find the existence of the five listed conditions. No other restrictions are placed on the commission's discretion to grant a variance, and no restrictions are placed on its discretion to determine the existence of the five conditions. *See id.*

Appellants alleged in their petition and continue to allege on appeal that the Planning Commission could not grant the variances because, in their view, none of the five conditions have been met. Appellants do not claim that members of the Planning Commission granted the variances without finding that the five conditions existed—the only limitation placed on their discretion to grant a variance.[10] Instead, based on their own analysis and interpretation of the conditions, Appellants contend that the Planning Commission made the wrong decision to grant the variance. But, because they had unconstrained discretion in finding that the five conditions existed, the members of the Planning Commission did not exceed the scope of their authority in finding the conditions existed, even if their findings were incorrect. *See Schroeder*, 646 S.W.3d at 335; *Hall*, 508 S.W.3d at 242. Neither the Code nor State

---

[10] The record shows that, in a written report, the Planning and Development Department's staff recommended to the Planning Commission that the variances be granted. The recommendation addressed each of the five conditions and found that they each existed. The Planning Commission's meeting minutes note the staff's recommendation along with the commission's grant of the variances. Accordingly, we do not give Appellants an opportunity to replead its ultra vires claim. *See Schroeder*, 646 S.W.3d at 335 n.42.

law "allow third parties to second-guess the [Planning] Commission's decision in this way." *Schroeder*, 646 S.W.3d at 335.

We conclude that Stein in her role as Director and a voting member of the Planning Commission was not without legal authority to approve the plat with the variances. And, to the extent that Brown, as Secretary and an ex officio member of the Planning Commission, played a role in the approval of the plat with the variances, we also conclude that she was not without legal authority to do so. Thus, the ultra vires exception does not apply to Appellants' claims against Stein and Brown, and they retained their governmental immunity from suit.

### 3. *David Northern, Sr.*

Appellants also sought a declaration that Northern, in his official capacity as CEO and president of HHA, had no legal authority to request variances for the 800 Middle subdivision plat and that "[Northern's] decision to do so constitute[d] an ultra vires act." Relevant to HHA's authority—and by extension Northern's authority—Chapter 392 of the Texas Local Government Code, entitled "Housing Authorities Established by Municipalities and Counties," governs, inter alia, the creation and regulation of municipal housing authorities like HHA. *See* TEX. LOC. GOV'T CODE §§ 392.001–.104. Section 392.051 provides that a municipal housing authority has "the powers necessary or convenient to accomplish the purposes and provisions of [Chapter 392]." *Id.* § 392.051. And section 392.052 states that HHA

"may provide for the construction . . . of a housing project," which will be subject to applicable ordinances. *See id.* § 392.052.

The City's Code provides that any subdivision of property, such as 800 Middle, requires a subdivision plat to be filed and approved. *See* HOUS., TEX., CODE OF ORDINANCES, ch. 42, art. II, § 42-20(a); *see also* TEX. LOC. GOV'T CODE § 212.004 (requiring plat for subdivision of property located in municipality). Thus, because it has the authority necessary to accomplish the construction of housing projects, such as 800 Middle, HHA has authority to file and seek approval of a subdivision plat for such a project. *See* TEX. LOC. GOV'T CODE §§ 392.051–.052.

Nonetheless, Appellants asserted that HHA and Northern were without authority to submit the variance requests along with the plat application because the variances would result in nonconformance with Chapter 42's street connectivity and spacing requirements. But, in making this argument, Appellants ignore the purpose of requesting a variance, which the Code defines to "mean a commission-approved deviation from the requirements of [Chapter 42] . . .." HOUS., TEX., CODE OF ORDINANCES, ch. 42, art. I, § 42-1. In other words, the very essence of a variance is its nonconformance with Chapter 42's requirements. And, as Appellants recognized in their petition, section 42-81 authorizes the Planning Commission "to consider and grant variances from the requirements of [Chapter 42]." *Id.* art. II, § 42-81(a). Thus, considering the relevant provisions of the Local Government Code and the

applicable City ordinances, Northern, as HHA's CEO and President, was not without legal authority to request the variances and any decision by Northern to request the variances was not ultra vires conduct. We conclude that the ultra vires exception does not apply to Appellants' claims against Northern and that he retained his immunity from suit.

Having determined that the three governmental officials retained their governmental immunity, we hold that the trial court properly granted the pleas to the jurisdiction regarding Appellants' claims against Stein, Brown, and Northern in their official capacities. Accordingly, we overrule Appellants' third issue.[11]

## Mandamus Petition

Relators Atkinson, Martinez, East End on the Bayou, and Reserve at East End have filed a petition for writ of mandamus related to the dispute regarding the approval of the 800 Middle subdivision plat. As "Respondents," Relators identify (1) David A. Northern, Sr., in his official capacity as President and CEO of HHA, (2) HHA, (3) the Planning and Development Department; (4) Margaret Wallace Brown, in her official capacity as Director of the City of Houston's Planning and

---

[11] Because the trial court lacked subject-matter jurisdiction over all of Appellants' claims based on governmental immunity, we need not reach Appellants' first and second issues challenging other jurisdictional bases for dismissal asserted by Appellees in their pleas to the jurisdiction. *See* TEX. R. APP. P. 47.1. Nor do we reach Appellants' fifth issue challenging the trial court's denial of their application for temporary injunction. *See id.*

Development Department; (5) the Planning Commission; (6) Martha Stein, in her official capacity as Chair of the Planning Commission; and (7) the City. *See* TEX. R. APP. P. 3.1(h)(2) (defining "respondent" to mean "a party against whom relief is sought in an original proceeding in an appellate court").

Government Code section 22.221(b) provides this Court with authority to issue a writ of mandamus against

> (1) a judge of a district, statutory county, statutory probate county, or county court in the court of appeals district;
>
> (2) a judge of a district court who is acting as a magistrate at a court of inquiry under Chapter 52, Code of Criminal Procedure, in the court of appeals district; or
>
> (3) an associate judge of a district or county court appointed by a judge under Chapter 201, Family Code, in the court of appeals district for the judge who appointed the associate judge.

TEX. GOV'T CODE § 22.221(b). An appellate court may also "issue a writ of mandamus and all other writs necessary to enforce the jurisdiction of the court." *Id.* § 22.221(a).

Section 22.221(b) does not authorize a court of appeals to issue a writ of mandamus against governmental entities and officials like Respondents. *See id.* § 22.221(b). And, in their petition, Relators have not shown, or even mentioned, that issuing a writ of mandamus is necessary to enforce this Court's jurisdiction.[12] *See*

---

[12] "The function of the writ of mandamus is to compel action by those who by virtue of their official or quasi-official positions are charged with a positive duty to act."

38

*id.* § 22.221(a). Accordingly, we lack subject-matter jurisdiction to issue a writ of mandamus against Respondents. *See In re Harrell*, No. 01-17-00873-CV, 2017 WL 6001534, at *1 (Tex. App.—Houston [1st Dist.] Dec. 5, 2017, orig. proceeding) (mem. op.) (per curiam).

For the reasons discussed, we dismiss Relators' mandamus petition for lack of jurisdiction. We dismiss all pending motions, including Relators' "Emergency Motion for Expedited Relief," as moot.

## Sanctions under Rules of Appellate Procedure 45 and 52.11

In their appellate brief, HHA and Northern ask this Court to sanction Appellants under Rule of Appellate Procedure 45 for bringing a frivolous appeal. And, in their response to the mandamus petition, HHA and Northern ask this Court to sanction Relators under Rule of Appellate Procedure 52.11 for filing a groundless mandamus petition.

### A.    Rule 45

Rule 45 provides that if a court of appeals determines that an appeal is frivolous, it may award a prevailing party just damages. *See* TEX. R. APP. P. 45. "Whether to grant sanctions for a frivolous appeal is a matter of discretion that this

---

*In re Castle Tex. Prod. Ltd. P'ship*, 189 S.W.3d 400, 403 (Tex. App.—Tyler 2006, orig. proceeding) (referencing *Boston v. Garrison*, 256 S.W.2d 67, 70 (Tex. 1953)). We note that, while they ask for "mandamus relief" in their petition, Relators do not identify what action by Respondents they seek to compel.

court exercises with prudence and caution and only after careful deliberation in truly egregious circumstances." *Gard v. Bandera County Appraisal Dist*., 293 S.W.3d 613, 619 (Tex. App.—San Antonio 2009, no pet.); *see Smith v. Brown*, 51 S.W.3d 376, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Notably, Rule 45 does not require an appellate court to award just damages in every case in which an appeal is frivolous. *Woods v. Kenner*, 501 S.W.3d 185, 198 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Glassman v. Goodfriend*, 347 S.W.3d 772, 782 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)). After reviewing the appellate record and briefing, we deny HHA and Northern's Rule 45 sanctions request.

## B.     Rule 52.11

In an original proceeding, Rule 52.11 permits sanctions for "filing a petition that is clearly groundless." TEX. R. APP. P. 52.11(a). However, "[a]n appellate court should exercise the discretion afforded by Rule 52.11 with caution and only after careful deliberation." *In re Cooper*, 320 S.W.3d 905, 911 (Tex. App.—Texarkana 2010, orig. proceeding). Adhering to these principles, we deny HHA and Northern's Rule 52.11 sanctions request.

## Conclusion

In appellate cause number 01-22-00435-CV, we affirm the trial court's judgment. In appellate cause number 01-22-00811-CV, we dismiss the petition for writ of mandamus for lack jurisdiction and dismiss all pending motions as moot.


Richard Hightower
Justice

Panel consists of Justices Goodman, Hightower, and Guerra.

41